## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA** *ex rel.* **TODD SCHMADL**

**STATE OF WISCONSIN** *ex rel.* **TODD SCHMADL**

Filed *In Camera* and under
seal pursuant to 31 U.S.C. §
3730(b)(2).

Plaintiff/Relator,

v.

**SELECT MEDICAL HOLDINGS CORPORATION,**

**And**

**SELECT SPECIALTY HOSPITAL-MADISON, INC.**

Defendants.

### Complaint for Damages and Injunctive Relief under 31 U.S.C. § 3729 *et seq.* and Wis. Stat. §20.931

NOW COMES Todd Schmadl Plaintiff/Relator, through his attorneys Cross Law Firm, S.C., by Nola J. Hitchcock Cross, Noah Reinstein, and Mary Flanner and as and for a complaint against Defendants, Select Medical Holdings Corporation and Select Specialty Hospital-Madison, Inc., states the following:

### Introduction

1.      This action is brought on behalf of the United States of America and the State of Wisconsin against Select Medical Holdings Corporation and Select Specialty Hospital-Madison, Inc., to recover for knowingly false claims they submitted for payment to the United States and the State of Wisconsin, through the Centers for Medicare and Medicaid Services ("CMS") in a

scheme to obtain maximum payments from the government while knowingly violating state and federal regulations required for payment and standards of care for delivery of healthcare to Government beneficiaries in a Long Term Acute Care Hospital setting.

2.      Relator Todd Schmadl brings this action on behalf of the United States of America pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq*. ("FCA"), and on behalf of the State of Wisconsin under the False Claims for Medical Assistance Act, Wis. Stat. § 20.931 This is an action for injunctive relief and to recover damages and civil penalties on behalf of the United States of America and State of Wisconsin arising from false billing claims and false representations made or caused to be made to the United States and/or State of Wisconsin and their agents and intermediaries in violation of the aforementioned statutes.

3.      The Defendants have violated the False Claims Act by engaging in the conduct described herein involving the following: A) making treatment decisions based length of stay of the patient rather than medical necessity in order to avoid adverse effects on their Government reimbursement; B) performing services not medically necessary; C) failing to meet the appropriate standard of care for billed services such that it was as if the services had not been performed and D) billing for services performed by unqualified personnel and/or not performed at all.  Defendants knowingly undertook efforts to fraudulently maximize government payments at the expense of the well-being of their patients.

## Jurisdiction and Venue

4.      Jurisdiction lies in this Court pursuant to 28 U.S.C. §§ 1331, 1345, and 31 U.S.C. § 3732(a).

5.      Jurisdiction over the Wisconsin law claims is appropriate pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

2

6.      Venue is proper in the Federal District Court, Western District of Wisconsin *inter alia*, pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction in the Western District of Wisconsin based on its systematic and continuous contacts in this district.

7.      Prior to the filing of this complaint Relator informed the United States Department of Justice of his intent to file and he provided  information regarding his claims.

## Parties

8.      Relator TODD SCHMADL ("Schmadl" or "Relator") is and has been at all material times a registered nurse—Wisconsin license number 128858-30 —who worked for Select Specialty Hospital-Madison, Inc. as a nurse from June 2011 through February 2012. Relator is a United States citizen and a resident of the City of Wisconsin Dells, Wisconsin in Juneau County, Wisconsin.

9.      Relator has direct and independent knowledge of the information on which the allegations set forth in this Complaint are based. Relator has knowledge of the information on which his allegations are based that is independent from any public disclosure about the matter and that materially adds to any such public disclosures.

10.     Defendant SELECT MEDICAL HOLDINGS CORPORATION ("Select") is a Delaware corporation with its principal offices located at 4714 Gettysburg Road, P.O. Box 2034, Mechanicsburg, PA, 17055.  Select Medical Holdings Corporation is a publicly traded company on the New York Stock Exchange with the ticker symbol SEM.  Select's registered agent for the service of process is The Corporation Trust Company whose address is 1209 Orange Street, Wilmington, DE 19801.

11.     Defendant Select owns or manages one-hundred and ten (110) long term acute care hospitals ("LTACH") with four thousand six hundred and twenty-seven (4,627) beds in twenty-eight (28) states.

12.     Long Term Acute Care hospitals serve a distinct role in the continuum of American healthcare by caring for patients who need longer than usual hospital stays, on average 25 days or more in contrast to the average length-of-stay in short-term hospitals, which is only 5-6 days.

13.     For the year ending December 31, 2011, Defendant Select's net operating revenues increased seventeen point three percent (17.3%) to two billion eight hundred four million five hundred thousand dollars ($2,804,500,000.00). Defendant Select's specialty hospital net operating revenues increased by twenty-three point one percent (23.1%) to two billion ninety-five million five hundred thousand dollars ($2,095,500,000.00).

14.     The average length of stay ("ALOS") for patients in Defendants' LTACHs was twenty-four (24) days for the year ended December 31, 2011.

15.     In the year ending December 31, 2011, Medicare was the source of approximately forty-eight point two percent (48.2%) of Defendant Select's net operating revenue from healthcare services.

16.     In the year ending December 31, 2011, Medicaid was the source of approximately three point three percent (3.3%) of Defendant Select's net operating revenue from healthcare services.

17.     Defendant SELECT SPECIALTY HOSPITAL-MADISON, INC., ("Select-Madison") is a Delaware corporation with its principal offices located at 4714 Gettysburg Road, Mechanicsburg, PA 17055.  Select-Madison's physical location is at 801 Braxton Place,

4

Madison, Wisconsin 53715 and its registered agent for service of process in the State of

Wisconsin is CT Corporation System 8040 Excelsior Drive, Madison, Wisconsin 53717. Select-

Madison is part of a national network of specialized long term acute care hospitals operated

and/or managed by Select.

18.     Defendant Select-Madison is a LTACH facility that maintains approximately

fifty-eight (58) beds.

19.     Select owns, controls, and is the parent company to Select-Madison. An allegation

against Select-Madison herein is intended to include Select as a responsible party inasmuch as

Select is the parent company integrally involved in Select-Madison's operations.  Collectively,

Select and Select-Madison will be referred to as "Defendants."

## BACKGROUND

### A.     Medicare/Medicaid Information

20.     The Medicare program was created in 1965 as part of the Social Security Act, 42

U.S.C. §§ 1395 *et seq.*, to provide a federally funded health insurance program for the aged,

disabled, or those afflicted with end-stage renal disease. The Center for Medicare and Medicaid

Service (CMS), a component of the Department of Health and Human Services (DHHS),

administers the Medicare program.

21.     The Medicare program is comprised of four parts designated as Medicare Parts A,

B, C, and D. Medicare Part A covers payments for institutional care, including hospital, long

term acute care hospitals, skilled nursing facilities and home health care. *See* 42 U.S.C. §§ 1395c

– 1395i-5. Medicare Part B covers payments for medically necessary physician services,

outpatient care, and some other services not covered by Part A. *See* 42 U.S.C. §§ 1395j – 1395w-

4.

22.     The Medicare, Medicaid, and State Children's Health Insurance Program ("SCHIP")Balanced Budget Refinement Act of 1999 (BBRA) (Pub. L. 106-113) and the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA) (Pub. L. 106-554) provide for payment for both the operating and capital-related costs of hospital inpatient stays in long-term care hospitals under Medicare Part A based on prospectively set rates.

23.     The Medicare prospective payment system (PPS) for LTACHs applies to hospitals described in section 1886(d)(1)(B)(iv) of the Social Security Act, effective for cost reporting periods beginning on or after October 1, 2002.

24.     Section 1886(d)(1)(B)(iv)(I) of the Social Security Act defines a LTACH as "a hospital which has an average inpatient length of stay (as determined by the Secretary of Health and Human Services (the Secretary)) of greater than 25 days." 42 C.F.R. § 412.23(e)(2).

25.     Section 123 of the BBRA requires the PPS for LTACHs to be a per-discharge system with a diagnosis-related group (DRG) based patient classification system that reflects the differences in patient resources and costs in LTACHs.

26.     Under the LTACH prospective payment system, PPS, patients are classified into distinct diagnostic groups based on clinical characteristics and expected resource needs. The patient classification system groupings under the LTACH PPS are called long-term care diagnosis-related groups (LTC-DRGs) and the LTACH is generally paid a pre-determined fixed amount applicable to the assigned LTC-DRG.

27.     The LTACH-PPS regulations define the criteria that must be met in order for a hospital to be certified as an LTACH. To be eligible for payment under the LTACH-PPS (prospective payment system), a hospital must be primarily engaged in providing inpatient

6

services to Medicare beneficiaries with medically complex conditions that require a long hospital

stay with an average length of stay of at least twenty-five (25) days.

28.     LTACHs must meet certain facility criteria, including (1) instituting a review

process that screens patients for appropriateness of an admission and validates the patient criteria

within forty-eight (48) hours of each patient's admission, evaluates regularly their patients for

continuation of care and assesses the available discharge options; (2) having active physician

involvement with patient care that includes a physician available on-site daily and additional

consulting physicians on call; and (3) having an interdisciplinary team of healthcare professional

to prepare and carry out an individualized treatment for each patient.

**B.      Long Term Acute Care Hospital**

29.     LTACHs provides medical and nursing services for a patient population

medically unable to go home or to a skilled nursing facility but not requiring the level of care

provided in a traditional hospital.

30.     LTACHs treat medically complex patients who require special monitoring,

intravenous ("IV") support, dialysis, special nutritional support, and those who are ventilator-

dependent and difficult to wean from ventilators.  Patients generally suffer from "medically

complex" conditions and multiple concurrent illnesses, including pulmonary disease, cardiac

disease, respiratory failure, pressure wounds, neuromuscular diseases, gastrointestinal diseases,

post-operative complications and end stage renal disease requiring dialysis.

31.     The purpose of the LTACH is to assist patients in reaching a level of functionality

that will enable them to return home or transfer to a rehabilitation center or skilled nursing

facility. LTACHs fill the gap between the traditional hospital and the skilled nursing facility for

those patients who require less  medically intensive care than that provided at a traditional hospital but more medically intensive than the care available at a skilled nursing facility.

**1.  Admissions**

32.     A patient is generally referred to Defendants' LTACH by a physician, case manager, discharge planner, health maintenance organization or insurance company.

33.     To qualify for LTACH admission, Defendant must document that the necessary level of care could not be safely provided in a less costly facility, such as a SNF or under home health care treatment.

34.     Both the Medicare and Medicaid programs pay for LTACH care for their beneficiaries.  To be eligible for Medicare of Medicaid reimbursement, LTACH facilities  must meet and maintain the minimum staffing, quality of life and other requirements set forth in the Social Security Act for standards of care, as well as all applicable state requirements and standards.

35.     Defendants' perform a clinical assessment of the patient to determine if the patient meets Defendants' criteria for admission. Based on the determinations reached in the clinical assessment, an admission decision is made by the attending physician.

36.     Upon admission, an interdisciplinary team comprised of  an attending physician, a specialty nurse, a physical, occupational, or speech therapist a respiratory therapist a dietician a pharmacist, and/or a case manager reviews the patient's  condition. Following the initial evaluation, the interdisciplinary team creates and implements an individualized treatment plan for the patient.

37.     The case manager coordinates all aspects of the patient's hospital stay and serves as a liaison with the insurance carrier's case management staff when appropriate. The case

manager communicates progress, resource utilization, and treatment goals between the patient,

the treatment team and the payor.

### 2. **Adequate Medical Care**

38.    All admissions to an LTACH must be medically "reasonable and necessary."

Medicare pays providers only for services that it considers are "reasonable and necessary for the

diagnosis or treatment of illness or injury or to improve a functioning of a malformed body

member" 42 U.S.C. § 1395y(a)(1)(A).

39.    When determining which patients should be admitted to an LTACH, medical

professionals must determine, given the patient's individual history and current medical

condition, if it is reasonable to expect that the patient will require a high level of care for over 25

days. 42 C.F.R. § 412.23(e)(2)(i).

40.    Providers, including LTACHs may not submit claims for services "of a quality

which fails to meet professionally recognized standards of health care."  42 U.S.C. § 1320c-

5(a)(2) (providers may not submit claims for inadequate care); 42 U.S.C. § 1320a-7b(a)(1) and

(3) (criminal penalties for submitting false claims when provider knows it has not continued right

to receive payment); 42 U.S.C. § 1320a-7(b)(6)(B) (provider can be excluded from participation

in Medicare for submitting claims for inadequate care).

41.    As a general practice, Defendants failed to provide care and services that met

Medicare's and Medicaid's requirements with regard to standard of care.

42.    Each and every of Defendants' violations of the standards of care constitutes a

violation of the conditions of participation for the Medicare and Medicaid programs.  The

submission of each claim for payment by Defendants for any of the services rendered that failed

to meet the standard of care were false, fraudulent, and in violation of the False Claims Act.

9

### 3.   Short Stay Outliers and Interrupted Stays

43.     Short stay outliers ("SSO") and interrupted stays in LTACHs affect eligibility for Government reimbursement. An SSO is a patient stay  between one day and up to and including 5/6ths of the mean average length of stay (ALOS) for the MS-LTC-DRG. If a patient is an SSO, the Government reimburses the LTACH  for the lowest amount of the following four options: 1) one-hundred percent (100%) of the cost of the case; 2) one-hundred twenty percent (120%) of the LTC-DRG per diem amount; 3) the full LTC-DRG amount; or 4) a blend of the IPPS amount for the DRG and one-hundred twenty percent (120%) of LTC per diem amount.

44.     Interrupted stays occur when patients are discharged to a hospital, inpatient rehabilitation facility, skilled nursing facility, or home and readmitted to the same LTACH within nine (9) days. If the patient is discharged and readmitted prior to the tenth day, it is considered an interrupted stay. Interrupted stays receive one payment because they are considered one discharge for payment purposes.

45.     Federal regulations require that LTACHs have an average length of stay for Medicare patients of at least 25 days to be certified as an LTACH. 42 C.F.R. §412.23.  Short-stay outliers reduce the LTACH's average length of stay and negatively affect their Government reimbursements.

46.     There is less scrutiny placed on normal-length stays than to short-stay outliers. A short-stay outlier is often an indicator of an improper admission. Patients that were improperly admitted because they were not ill enough to require LTACH care are often able to leave the LTACH sooner than expected. Also, patients who were improperly admitted because they were too ill for an LTACH stay often must return to a traditional hospital shortly after admission. Thus, many short-stay outliers result from improper admissions.

## FACTUAL ALLEGATIONS OF FRAUD

**Wound Care Services Billed But Not Performed**

47.     Throughout Relator's employment he became familiar with Select-Madison's practice of billing for wound care services that were not provided.

48.     Select-Madison's practice was to document in patient's medical records that wound care and a change of wound dressing had been provided to a patient when in fact no such care or dressing change had occurred.

49.     Relator personally observed the medical records of patients where it was indicated that wound care and wound dressing change had occurred.  When Relator provided services to the patient it was evident that no wound care or dressing change had occurred, although such service was falsely documented in the medical records on the dates in question, because Relator could see that the wound dressing was old and unchanged.

50.     Relator also personally spoke with patients who informed him that their wound dressing had not been changed despite the medical charts indicating that such a change had occurred.  Relator estimates that such conversations occurred at least weekly during the course of his employment.

51.     Despite the fact that no wound care or dressing change had occurred, Select-Madison billed Medicare for services allegedly provided.

**Respiratory Therapy Services Billed But Not Performed**

52.     Throughout Relator's employment he became familiar with Select-Madison's practice of billing for respiratory therapy services and medications that were not provided.

53.     Select-Madison utilizes an electronic medication administration record (eMAR) system to track the delivery and assist with the billing of patient medication.

54.     When utilizing the eMAR system, the healthcare professional scans a unique patient barcode, provides the patient with the medication and then scans a unique barcode for the medication provided.

55.     As soon as a medication is scanned in the eMAR system, it is billed to the account of the patient—and subsequently Medicare or Medicaid—whose barcode was scanned as having received that medication without regard to whether any medication was ever actually administered to the patient.

56.     Select-Madison's practice was to indicate that respiratory therapists provided the medications and attendant services for the administration of that medication, when no such medication or services were provided.

57.     Relator personally observed Select-Madison's respiratory therapists scanning patient barcodes and nebulizer medication barcodes into the eMAR system even though the patient had not been provided with the nebulizer medication.

58.     Relator also personally spoke with patients who informed him that they had not received their nebulizer medications or seen the respiratory therapist despite the medical charts indicating that such medications had been provided to the patients by the respiratory therapist.

59.     Despite the fact that no nebulizer medications or respiratory therapist services had been provided, Select-Madison billed Medicare and Medicaid for services and medications allegedly provided.

**Physical Therapy Services Provided by Unqualified Practitioners**

60.     To be reimbursable by Medicare, skilled services, such as physical therapy must relate directly and specifically to a treatment program designed to treat the patient's condition and be "reasonable and necessary." To be considered as "reasonable and necessary," the services

12

must (1) be "specific, safe, and effective treatment for the beneficiary's condition," (2) be of such a "level of complexity and sophistication or the condition of the beneficiary must be such that the services can safely and effectively be performed only by a qualified" therapist, (3) be expected to improve the patient's condition materially in a reasonable period of time, and (4) be or a reasonable amount, frequency, and duration. 42 C.F.R § 409.44(b)

61.     Throughout Relator's employment, he became aware of Select-Madison's practice of billing for Physical Therapy services that were performed by individuals who are not licensed physical therapists.

62.     Relator personally observed orders for physical therapy to be provided to patients. The orders may have been legitimate orders and would have been appropriate to bill to Medicare and/or Medicaid but for the fact that the therapy was provided by non-licensed individuals.

63.     On multiple occasions Relator observed physical therapy orders that had notations of "Nursing to do" or other words of a similar effect, meaning that the work was not to be performed by licensed physical therapists.

64.     Select-Madison's practice was to bill for physical therapy services but to allow those services to be provided by non-qualified personnel such as registered nurses ("RNs" or licensed practical nurses ("LPNs").

**Providing Unnecessary Medication**

65.     Select-Madison frequently provides intravenous (IV) medications to its patients. The delivery of IV medications may be either through a "drip mode" which provides a constant flow of medication based upon time (i.e. 1.5mg/hour) or through a "dose mode" which calculates the appropriate dosage based on the weight of the patient (i.e. 1.8mcg/kg).

66.     When delivering IV medication through dose mode, the precise amount of medication can be administered based upon the patient's weight.  When delivering medication through drip mode, the constant rate of medication will continue until the delivery is stopped. Certain medications should be provided only in dose mode to ensure that a patient is not provided with more medication than is medically necessary.  Providing more of a medication than is necessary can have adverse effects on a patient up to and including death due to an overdose.

67.     Select-Madison regularly provided medication in drip mode rather than dose mode which not only resulted in medically unnecessary medication being administered to patients and billed to Medicare and/or Medicaid, but also put patients' health at risk and greatly increased the possibility for a fatal overdose due to receiving an amount of medication in excess of what was prescribed.

68.     As a representative example, in January 2012 Medicare patient A.S. was supposed to be receiving Dobutamine in dose mode at the rate of 1.5mcg/kg, per doctor's orders.  Relator observed that A.S. was receiving the Dobutamine in drip mode at the rate of 1.9ml/hour despite the fact that her medical chart indicated that she was receiving the medication at the rate of 1.5mcg/kg.

69.     As a result of the improper calibration of the administration of A.S.'s Dobutamine, A.S. received a medically unnecessary amount of Dobutamine, which could lead to arrhythmia or other life-threatening heart problems.

Providing Medically Unnecessary Procedures

70.     Throughout Relator's employment he became familiar with Select-Madison's practice of administering and billing for medically unnecessary x-rays and blood tests.

14

71.     On numerous occasions throughout Relator's employment he became aware that Select-Madison was ordering x-rays and complete blood count tests for patients who had no medical necessity for such tests.

72.     The result of such practices is that Select-Madison would bill Medicare for tests that did not need to be performed, provided no benefit to the patient, and had no medical purpose.

**Manipulating the Course of Treatment, Discharge and Admission Decisions Based on ALOS, SSO and Interrupted Stays to Falsely Obtain Government Payments**

73.     As a regular practice of Select-Madison, patients' treatment and discharge decisions were not based solely on patient needs but on decisions to increase the profitability of Select-Madison.

74.     As described *supra*, if a patient is considered a short stay outlier, Select-Madison would receive a smaller reimbursement from Medicare than if that individual met at least 5/6 of Select-Madison's ALOS.  In order to maximize reimbursement, Select-Madison intentionally retained patients for longer than necessary to increase profit and avoid the financial hit from a short stay outlier.

75.     One measure Select-Madison would take was to provide minimum amounts of care until it became clear that the patient would be able to meet at least 5/6 of the ALOS.

76.     Another measure that Select-Madison would take to insure a patient would not be an SSO was to provide patients who needed ventilators with more oxygen support than was necessary.  The result of this practice was to make it intentionally more difficult for the individual to wean off of the ventilator and thereby cause a longer length of stay.

77.     Once a patient was at or near the ALOS, Select-Madison would take aggressive steps to discharge patients from service even when discharge was not medically appropriate.

15

Select-Madison took these steps in order to falsely obtain Government payments, as a patient who stayed in excess of the ALOS would no longer generate additional revenues for Select-Madison.

78.     Similar to a patient who is an SSO, Select-Madison would be less profitable when they had patients who had "interrupted stays."  In order to prevent interrupted stays, Select-Madison would not readmit patients until they had been off service with Select-Madison for at least nine days, despite the medical necessity for such patients having LTACH services.

**Providing sub-standard care**

79.     Defendants frequently provided services to its patients that failed to meet the appropriate standard of care.  Due to the poor standard of care provided, patients' health was put in jeopardy which in several cases resulted in the death of the patient.

80.     As a representative example, patient A.S., who was admitted to Select-Madison in or around January 2012 with kidney and heart failure, received substandard care.

81.     A.S. was on kidney dialysis and was given a hemo-dialysis catheter. Approximately two weeks after admission and use of the hemo-dialysis catheter, A.S. began producing urine and was able to have the hemo-dialysis catheter removed.

82.     After A.S. had the catheter removed, she began to rapidly gain weight and stopped producing urine.  Despite the fact that the amount of fluids taken in by A.S. and the lack of urine output by A.S. was charted, Defendants ignored the signs of renal failure and did not attempt to correct the situation by performing dialysis.

83.     Defendants intentionally failed to follow the appropriate standards of care by failing to record and monitor A.S's weight and by failing to recognize the lack of urine output was a sign of renal failure.

16

84.     After several days of rapid weight gain without intervention, predictably, A.S. died.

85.     As another representative example of substandard care, patient F.P. was admitted to Select-Madison in or around December 2011 after surgery where a piece of bone was removed from F.P's skull to reduce swelling of the brain.

86.     As a result of defendants' general policy, F.P.'s condition was not properly monitored and as a result, F.P had a large mass protruding from the location of the bone removal as well as swelling of his pupils.

87.     Despite the immense swelling imminent danger to F.P., Defendant's took no action to provide care to F.P.  Several days after the aforementioned swelling started, F.P. died.

## COUNT ONE
## PRESENTING FALSE CLAIMS FOR MEDICAL ASSISTANCE
## CONTRARY TO 31 U.S.C. § 3729(a)(1)(A)

88.     Relator re-alleges and incorporates by reference all previous paragraphs.

89.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

90.     For the purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person, … (1) has knowledge of the information, (2) acts in deliberate ignorance of the truth or falsity of the information, or (3) acts in reckless disregard of the truth or falsity of the information and no proof of specific intent to defraud is required." 31 U.S.C. 3729(b).

91.     Through the acts described above, Defendants and its agents and employees knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval.

92.     The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws, regulations, and contract in an as of yet undetermined amount.

93.     With respect to the aforementioned misrepresentations and failures to comply, Defendants knowingly made false claims to officials of the United States for the purpose of obtaining compensation and Defendants received such compensation from the United States Government as a result of Defendants' false claims.

**COUNT TWO**
**PRESENTING FALSE CLAIMS FOR MEDICAL ASSISTANCE**
**CONTRARY TO  31 U.S.C. § 3729(a)(1)(B)**

94.     Relator re-alleges and incorporates by reference all previous paragraphs.

95.     The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

96.     Through the acts described above, Defendants and its agents and employees knowingly made, used, and/or caused to be made or used a false record or statement material to a false or fraudulent claim to Medicare and Medicaid in order to obtain reimbursement for services otherwise not deserving of government reimbursement.

97.     The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws, regulations, contract, and agreements in an as of yet undetermined amount.

98.      With respect to the aforementioned misrepresentations and failures to comply, Defendants knowingly made false claims to officials of the United States for the purpose of

18

obtaining compensation and Defendants received such compensation from the United States Government as a result of Defendants' false claims.

## COUNT THREE
## RETAINING KNOWN OVERPAYMENTS
## CONTRARY TO 31 U.S.C. § 3729(a)(1)(G)

99.     Relator re-alleges and incorporates by reference all previous paragraphs.

100.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(G), imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

101.    Through the acts described above, Defendants and its agents and employees knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the Government.

102.    The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws, regulations, and contract in an as of yet undetermined amount.

103.    With respect to the aforementioned misrepresentations and failures to comply, Defendants knowingly made false claims to officials of the United States for the purpose of obtaining compensation and Defendants received such compensation from the United States Government as a result of Defendants false claims.

## COUNT FOUR
## Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(a)
## DEFENDANTS KNOWING SUBMISSION OF FALSE CLAIMS FOR PAYMENT

104.    Relator re-alleges and incorporates by reference the allegations contained in

the preceding paragraphs of this Complaint.

105.     This is a claim for treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(a).

106.     By virtue of the fraudulent concealment, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly presented or caused to be presented to the Wisconsin Medicaid Program false or fraudulent claims for payment or approval.

107.     The Wisconsin Medicaid Program, unaware of the falsity or fraudulent nature of the claims submitted by Defendants, paid for claims that otherwise would not have been allowed.

108.     By reason of these payments, the Wisconsin Medicaid Program has been damaged, and continues to be damaged in a substantial amount.

**COUNT FIVE**
**Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(b)**
**DEFENDANTS KNOWING CREATION OF FALSE RECORD OR STATEMENT**
**MATERIAL TO FALSE CLAIM**

109.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

110.     This is a claim for treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(b).

111.     By virtue of the fraudulent concealment, misrepresentations and submissions of non-reimbursable claims described above, Defendants knowingly accomplished these unlawful acts by making, using, or causing to be made or used a false record or statement, in violation of Wis. Stat. §20.931(2)(b).

112.     The State of Wisconsin, unaware of the falsity or fraudulent nature of the claims

20

that Defendants caused, paid for claims that otherwise would not have been allowed and may not have otherwise been submitted.

113.    By reason of these payments, the State of Wisconsin has been damaged, and continues to be damaged in a substantial amount.

## COUNT SIX
### Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(h)
### KNOWING OR IMPROPER AVOIDANCE OF REPAYMENT OF GOVERNMENT FUNDS

114.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

115.    By their actions and inactions described above, Defendants has received funds for knowingly submitted false claims and has failed to timely return such funds despite a legal obligation to do so once Defendants had knowledge of the fraudulent receipts, pursuant to Wisconsin False Claims for Medical Assistance Act, Wis. Stat. §20.931(2)(h).

116.    By reason of these payments, the State of Wisconsin has been damaged, and continues to be damaged in a substantial amount.

## PRAYER FOR RELIEF

WHEREFORE, the United States is entitled to damages from Defendants in accordance with the provisions of 31 U.S.C. §§ 3729-3733, as amended, and Wis. Stat. § 20.931 of which up to twenty-five percent (25%) should be paid to the *qui tam* plaintiff, Todd Schmadl, and such further relief as this Court may deem appropriate or proper.

AND WHEREFORE, Plaintiff/Relator requests that judgment be entered against Defendants, ordering that:

a.  Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.* and Wis. Stat. § 20.931;

b.  Defendants pay an amount equal to three times the amount of damages the United States has

    sustained because of Defendants' actions, plus a civil penalty against each Defendant of not

    less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 and

    Defendants pay not less than $5,000 and not more than $10,000 for each violation of Wis.

    Stat. § 20.931;

c.  Plaintiff/Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d)

    and Wis. Stat. §20.931 as *qui tam* Plaintiff;

d.  Plaintiff/Relator be awarded a make whole remedy pursuant to the mandates of Wis. Stat. §

    20.931(14) including payment of attorneys' fees, expenses and costs;

e.  Plaintiff/Relator be awarded all costs of this action, including attorneys' fees, expenses, and

    costs pursuant to 31 U.S.C. § 3730(d);

f.  The State of Wisconsin, United States and Plaintiff/Relator be granted all such other relief as

    the Court deems just and proper.

**PLEASE TAKE NOTICE THAT THE PLAINTIFF/RELATOR DEMANDS THE ABOVE
ENTITLED ACTION TO BE TRIED TO A 12-PERSON JURY.**

Dated this 17th day of July 2013.

**CROSS LAW FIRM, S.C.**
**Attorneys for Plaintiff**

By:_____**s/Noah Reinstein**____

Nola J. Hitchcock Cross
State Bar No. 1015817
Noah Reinstein
State Bar No. 1056754
Mary C. Flanner
State Bar No. 1013095

845 N. 11th Street
Milwaukee, WI 53233
Phone: (414) 224-0000
Fax:    (414) 273-7055

njhcross@crossalawfirm.com
nreinstein@crosslawfirm.com
mflanner@crosslawfirm.com
www.crosslawfirm.com